# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>KWASI GYAMBIBI,<br>*Defendant*. | No. 3:18-cr-00136 (JAM) |

## ORDER DENYING MOTIONS FOR JUDGMENT OF ACQUITTAL

The Government charged Kwasi Gyambibi and his spouse, Dr. Kakra Gyambibi, with conspiracy to engage in healthcare fraud (18 U.S.C. § 1349) and with substantive counts of healthcare fraud (18 U.S.C. § 1347). In essence, the Government charged the Gyambibis with acting together to fraudulently cause the submission of claims for prescription drug benefits to health care benefit plans despite knowing that there was no valid prescription to support these claims.

Although Dr. Gyambibi entered a plea of guilty to the conspiracy charge, Kwasi Gyambibi elected to proceed to trial. The jury heard trial evidence over the course of several days in February 2019 and then returned a mixed verdict: guilty on two counts (Counts 4 and 5), not guilty on seven counts (Counts 10 to 16), and no verdict at all on the remaining counts (Counts 1 to 3, 6 to 9, and 17 to 19).

Gyambibi moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal during trial and then again after trial. I will now deny the motions. Notwithstanding the jury's decision to acquit Gyambibi on numerous counts of the indictment, I conclude as to the remaining counts that the evidence was legally sufficient to allow for a jury verdict in the Government's favor.[1]

---

[1] My conclusion that the evidence was legally sufficient means that it sufficed to support the jury's verdict as to the two counts on which the jury returned a verdict of guilty and that there is no bar to a re-trial (if the Government so

## BACKGROUND

The following facts are set forth based on the trial evidence as viewed in the light most favorable to the Government. The evidence at trial focused on Gyambibi's dealings with the Advantage Pharmacy in Mississippi, a pharmacy that specialized in making custom-made "compound" medications. Some of these compounds were very expensive. For example, the pharmacy made a skin cream for which it charged about $11,000 for a large toothpaste-sized tube. This skin cream was priced inversely to its medical importance—to treat minor maladies such as stretch marks and keloids.

The pharmacy used a sales force to promote its products nationwide. One of its sales agents was Leroy Prempeh, who was a close cousin of Gyambibi and who received a commission between 10% to 35% on pharmacy products he sold. During 2014 and 2015, Gyambibi coordinated with Prempeh to act as a sub-sales agent for the pharmacy's products.

At the time Gyambibi had a day job with the student services office at the University of Connecticut. He recruited friends and workplace associates to persuade them to place orders for the pharmacy's high-priced products. He did not tell them how much the products cost. They gave him their health plan insurance information so that the product costs could be billed to their health plans. Gyambibi would ordinarily record this information on an order form that he faxed to the pharmacy in Mississippi. After the pharmacy received the order, it would contact Gyambibi's friend or associate to verify the order and then subsequently mail the product to the friend or associate while in turn billing the relevant healthcare benefit plan.

---

chooses) on the remaining counts for which the jury was unable to reach a verdict. *See Hoffler v. Bezio*, 726 F.3d 144, 162 (2d Cir. 2013). My findings here are solely with respect to whether the evidence was legally sufficient to support a conviction in light of my obligation at this juncture to view the evidence in the light most favorable to the prosecution. The descriptions of evidence in this ruling do not constitute formal findings for purposes of any sentencing hearing that may occur in this case.

Many of the orders included automatic refill requests. This meant, for example, that if an order had been placed for one of Gyambibi's friends or associates to receive a single tube of $11,000 skin cream, the pharmacy would send and bill again for refill tubes every few weeks. Gyambibi's friends and associates generally did not use the products that they received from the pharmacy and sometimes did not even open the packages when they arrived from the pharmacy.

Most significantly for purposes of this prosecution, the high-priced pharmacy products at issue required a prescription. The signature of a prescribing physician appeared on all the order forms that were faxed to the pharmacy. The trial evidence included many order forms bearing the signatures of either Dr. Gyambibi or Betty Exume, a physician's assistant who worked at the same hospital as Dr. Gyambibi.

The problem was that none of Gyambibi's friends or associates were actually patients of Dr. Gyambibi or Exume. Neither Dr. Gyambibi nor Exume spoke or met with any of Gyambibi's friends or associates to determine if the medications would be safe or medically appropriate. For some of the forms that Gyambibi faxed to the pharmacy, he did not even bother to have Dr. Gyambibi or Exume sign the form; instead, he just filled out a blank order form that already had a photocopy of one of the doctor's signatures as the putative prescribing physician.

The trial evidence included email communications reflecting that Dr. Gyambibi was well aware that her prescription signature was being used to dispense medications for people who were not her patients. Indeed, at one point when Dr. Gyambibi's office received a query about an order that had been placed under her prescription signature for a person that she had never met, she emailed Gyambibi (who is not a physician) to ask what medication he had prescribed to this unknown person.

Trial testimony established that neither the pharmacy nor the insurance companies would have filled or paid for these prescription drug orders if they had known that the supporting prescription was issued by a physician who had never seen or treated the recipient of the medication. The insurance companies paid out more than $1 million as a result of the Gyambibis' actions in 2014 and 2015, resulting in the pharmacy's payment of about $366,000 in sales commissions to Gyambibi's cousin.

## DISCUSSION

For purposes of a motion for a judgment of acquittal, I must review the evidence in the light most favorable to the Government, defer to the jury's assessments of the credibility of witnesses as well as the weight of the evidence, and sustain the jury's verdict if any rational trier of fact could have found the evidence sufficient to establish the essential elements of the crime beyond a reasonable doubt. *See, e.g.*, *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018).

As noted above, Gyambibi was charged with multiple counts of healthcare fraud (Counts 1 to 18) and one count of healthcare fraud conspiracy (Count 19). The Court instructed the jury on the three elements that the Government must prove to sustain a charge for healthcare fraud under 18 U.S.C. § 1347: (1) that there was a scheme as alleged in the superseding indictment to defraud a health care benefit program in connection with the payment for prescription drugs; (2) that Gyambibi knowingly and willfully participated in this scheme to defraud with the intent to defraud; and (3) that Gyambibi either submitted or caused someone else to submit a false claim for payment for a prescription drug for which he knew that no valid prescription had issued. Doc. #115 at 9. The Court further instructed the jury on the two elements the prosecution must prove to sustain a charge for healthcare fraud conspiracy under 18 U.S.C. § 1349: (1) that there existed a conspiracy (*i.e.,* an unlawful agreement) between two or more persons as alleged in the

indictment to commit health care fraud; and (2) that Gyambibi knowingly, willfully, and voluntarily became a member of or a participant in the conspiracy. *Id.* at 16.

Gyambibi's motion for judgment of acquittal does not take issue with the Government's evidence about what he did. For example, he does not contest that he recruited friends and associates to receive the pharmacy's products, that he used the signatures of both his spouse and Exume on prescription order forms that were submitted to the pharmacy, and that he knew that none of his friends or associates were patients of his spouse or Exume. Instead of disputing these facts, he argues that there was no evidence of his fraudulent intent—namely, there was no evidence that he "knew that the healthcare insurers involved would not have paid for the medications had they known that Dr. Gyambibi did not personally meet with the patients before signing the prescriptions." Doc. #122 at 2.

I do not agree for substantially the reasons stated by the Government in its opposition memorandum. The jury could well have concluded as a matter of common sense that Gyambibi or any other reasonable person would know that no health insurance company would willingly spend money on financing prescription medications for which there was no doctor who had determined the prescription to be medically safe and appropriate. A sensible jury could have concluded that someone like Gyambibi would understand that a valid medical prescription means something more than a doctor's signature on a piece of paper for someone the doctor has never met or treated as a patient. The evidence was enough to allow for a reasonable jury to conclude that Gyambibi acted with intent to defraud by promoting the submission of claims for prescription drugs on behalf of persons whom he knew had not been issued a valid prescription.

Moreover, as the Government notes, there was at least one incident that would surely have put Gyambibi on notice of the requirement that there be a genuine doctor-patient

relationship. In July 2014, the pharmacy advised Gyambibi's cousin (who in turn told Gyambibi) that there was a "big problem" because one of Gyambibi's recruits had let slip that the recruit had not seen a doctor. The pharmacy's suspicions were also aroused by Gyambibi's use of the UConn Student Services fax header rather than a doctor's cover sheet. After this alert, Gyambibi switched to faxing subsequent order forms from a different fax number and often using his spouse's medical letterhead form as a cover sheet. A reasonable jury could well have concluded from this incident that Gyambibi intended to defraud as to the existence of a medically valid prescription to support claims for prescription drug benefits.

Although the Court's assessment of the sufficiency of the evidence does not turn on what the jury actually found, it is noteworthy that the only two counts (Counts 4 and 5) on which the jury convicted Gyambibi involved prescription forms that were issued in the name of Betty Exume rather than Dr. Gyambibi. As to those counts involving Exume, the evidence of fraudulent intent was stronger than for those counts involving Dr. Gyambibi. Exume was called as a trial witness and testified that Gyambibi obtained her signature on a blank order form and that she was not told about a person known as "M.R." for whom medication would be ordered as a result of Gyambibi's efforts.

Based on this testimony of Exume, the jury may well have concluded that Gyambibi must have acted with intent to defraud at least as to Counts 4 and 5. By contrast, Dr. Gyambibi did not testify at trial, and the jury did not learn that she had pleaded guilty to the conspiracy charge. The jury may have wondered whether Dr. Gyambibi had authorized Gyambibi to use her name on prescription forms or assured him that it would not be wrong to do so. These possible points of distinction notwithstanding, the fact that the evidence as to the counts involving Exume was

stronger than for the remaining counts involving Dr. Gyambibi does not signify that the evidence presented for these latter counts was altogether legally insufficient.

Lastly, Gyambibi challenges the sufficiency of evidence to support the conspiracy charge. For the reasons outlined above concerning the sufficiency of evidence as to Gyambibi's intent to defraud, a reasonable jury could have concluded that both Gyambibi and Dr. Gyambibi knowingly and willfully conspired with one another to defraud healthcare benefit companies by means of causing the submission of claims for which they knew there was no valid prescription supported by a genuine physician-patient relationship. Although Gyambibi argues that it was the pharmacy and not him that actually submitted the false claims for payment to the health plans, the evidence was sufficient to show that both Gyambibi and Dr. Gyambibi knew these claims would be submitted. The evidence to support the conspiracy charge was sufficient.

## CONCLUSION

For the foregoing reasons, the motions for judgment of acquittal (Docs. #101, #118) are DENIED.

Dated at New Haven this 16th day of October 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge